**IN THE COURT OF APPEALS OF IOWA**

No. 14-0699
Filed June 25, 2014

**IN THE INTEREST OF G.B.,**
**Minor Child,**

**J.B., Father,**
**Appellant.**

_____

Appeal from the Iowa District Court for Cherokee County, Mary L. Timko, Associate Juvenile Judge.

A father appeals the termination of his parental rights.  **AFFIRMED.**

Marvin W. Miller Jr. of Miller, Miller, Miller, P.C., Cherokee, for appellant father.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Ryan Koplin, County Attorney, and Kristal L. Phillips, Assistant County Attorney, for appellee State.

Lesley Rynell of Juvenile Law Center, Sioux City, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, J.**

James appeals from the termination of his parental rights to a daughter. The juvenile court terminated his rights pursuant to Iowa Code section 232.116(1)(d), (e), (f), and (g) (2013).[1] The father contends the State did not make reasonable efforts to reunify parent and child. He also asserts the court

---

[1] As relevant here, section 232.116(1) allows the court to terminate parental rights if:

. . . .

(d) The court finds that both of the following have occurred:

(1) The . . . court has previously adjudicated a child who is a member of the same family to be a child in need of assistance [(CINA)] after such a finding.

(2) Subsequent to the [CINA] adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

(e) The court finds that all of the following have occurred:

(1) The child has been adjudicated a [CINA] pursuant to section 232.96.

(2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.

(3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so. . . .

(f) The court finds that all of the following have occurred:

(1) The child is four years of age or older.

(2) The child has been adjudicated a [CINA] . . . .

(3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months . . . .

(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

(g) The court finds that all of the following have occurred:

(1) The child has been adjudicated a [CINA] . . . .

(2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family . . . .

(3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.

(4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

erred in failing to grant him an additional six months to seek reunification. We affirm.

**I. Scope and Standard of Review.**

Our review of proceedings terminating parental rights is de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We give weight to the findings of the trial court, though we are not bound by them. *Id.*

**II. Facts.**

G.B. was born in 2007 and removed from her mother Jessica's care in 2012 due to a denial of critical care.[2] G.B. has never met her father. G.B. was adjudicated a child in need of assistance (CINA) in February 2013. The father, who lived in Wisconsin, was notified of the CINA proceedings involving G.B. He has participated in the proceedings telephonically and through counsel, but has never attended hearings in person.

The father did not come to these juvenile proceedings with a blank slate. *See In re M.B.*, No. 08-0673, 2008 WL 2357681 (Iowa Ct. App. June 11, 2008) (affirming the termination of the father's parental rights to G.B.'s siblings, M.B. and M.B.). In our opinion affirming the termination of the father's rights to G.B.'s older siblings, we said:

> The evidence at trial showed a lengthy and extreme history of physical and mental abuse perpetrated by James upon his children.[fn] The reported instances of abuse on one or more of the children included beatings with a metal cane, belts, wood, and shoes, shooting the children in the head with an air gun, threats to kill them, kicking, whippings, chokings and extreme verbal abuse and threats. These incidents of abuse left an abundance of

---

[2] A child protective services investigation found Jessica had given G.B. medication prescribed to G.B.'s brother in an effort to get her to sleep. Jessica voluntarily agreed to have G.B. placed in foster care in November 2012.

physical manifestations. Despite the wealth of evidence, including his guilty plea to child endangerment, James persisted in his denials of the abuse. Moreover, by the time of the termination hearing, James had not seen the children for almost two years and had done little to facilitate reunification. To return the children to James's care would almost certainly subject them to further adjudicatory harm.

*M.B.*, 2008 WL 2357681, at *2 (footnote indicates, "James has three older children, upon whom the record reflects severe abuse was also inflicted."). While the earlier juvenile proceedings were ongoing, the father left Iowa and moved to Wisconsin knowing Jessica was pregnant.

In the earlier termination proceedings, the father argued that the department of human services (DHS) failed to make reasonable efforts to reunify him with his children. We rejected his claim then:

DHS repeatedly informed James visitation would be dependent on his participation in counseling services. James chose to ignore this directive until after the termination petition was filed. Sometime after the March 2007 dispositional hearing, he moved to Wisconsin, without notifying DHS. He thus chose to distance himself from his children as well as any services offered by DHS. Moreover, he only made the request for a home study less than one month prior to the termination hearing. In light of this, we conclude the State's reunification efforts were reasonable.

*Id.* at *1.

In the instant proceedings, on March 23, 2013, James requested a home study of his Wisconsin residence. A March 27, 2013 dispositional hearing was held. The court ordered that if James was determined to be G.B.'s biological father, a home study should be conducted, and contact between James and G.B. would be at the discretion of the DHS.

James's paternity of G.B. was established in March 2013.

On August 22, 2013, James requested the home study be completed. The home study report was received by DHS on September 26, 2013. The evaluator did not recommend placement with James "due to his history of termination of parental rights on two other children and the fact that James and [G.B.] have never met. It is my belief that several changes would need to be made before consideration was made for placement including visitation, counseling, and parental education." More specifically, the evaluator wrote:

> There are several factors that went into making a placement recommendation for [G.B.] The main concern is that this worker has knowledge that James' parental rights were terminated on 2 children, [M.B] and [M.B.] and that there is little information from the referring state indicating what the circumstances were. James indicates that he has had counseling, however this worker would need information from a counselor or doctor indicating some evidence of rehabilitation. This worker also has concerns regarding [G.B.]'s stability and best interest. [G.B.] has had phone contact less than 10 times with her father and has never met him in person. [G.B.] is connected to her grandmother with whom she resides and currently is living with her half sister. Taking her away from any family that she knows would be detrimental. It has been several years since James has had responsibility for young children. His current spouse, Billie, has children that she does not have contact with. This worker would not recommend placement of Grayson with [James] at this time. Worker would recommend an opportunity for visitation with James and [G.B.] and time to work on getting to know each other. Worker would also recommend some documentation of counseling services and perhaps ongoing counseling to address placement of [G.B.] The Oconto County Department of Health and Human Services offers parenting classes free of charge that could certainly benefit James and Billie. The Iowa Department of Human Services could then decide on the appropriateness of a subsequent home study 6-12 months after ongoing contact with James and [G.B.] and cooperation with the Department.

A review hearing was held on October 8, 2013, and on October 9, the court entered a review order, which reads in part:

A home study was completed on James [B.]  It was denied for placement, in part, due to the fact that he has no relationship with [G.B.] and he has had his parental rights to other children terminated.  James did testify that he wants a relationship with [G.B.] and he will do whatever is needed.  His goal is to have [G.B.] placed in his home through the use of visits, the Department of Human Services' support, and the provision of a normal life.  He stated that, "Once you are a parent, you know what to do."

James testified that he would work with the Department of Human Services in Iowa and Wisconsin and will use his resources for purposes of visits.  He indicated that he would come to the State of Iowa to have visits.  He acknowledged that he does not have a relationship with [G.B.] and, in fact, left Iowa prior to her birth.  He testified he was not sure that [G.B.] was his biological child, although he did feel that she was and now believes it.  James indicated that although he has already participated in counseling and parenting classes and similar services, he will re-engage in those services if given an opportunity to be reunited with [G.B.].

James' wife, [Billie], and 20-year-old son . . . are very excited to have [G.B.] placed in their home.  Apparently, [Billie] does not have custody of her own children due to some bad decisions she made regarding a person she has previously resided with who was a sex offender.

Although James was found to be the biological father, he has paid nothing to financially support [G.B.], indicating there was no court order in place to do so.

The court did admonish both James and Jessica that the next three months will be important.  They will need to show the court that they should be given an additional six months to work toward reunification of [G.B.] with either one of them.  At this time, both James and Jessica have a significant amount of work to do.  The court suggested to James that he begin to write letters to [G.B.] and to cooperate with visitation in the State of Iowa.

The court finds reasonable efforts were made to avoid the necessity of an out-of-home placement and that return of the child to a parental home would be contrary to her well-being, given the fact that [G.B.] has no relationship with James . . . .

The father requested an amendment to the adjudication order to "expedite" services in Wisconsin.  On November 14, 2013, the juvenile court granted the application and ordered the father "to attend parenting classes, love and logic classes, and to attend individual therapy, all in relation to reunification to his daughter."

On November 25, 2013, G.B.'s therapist wrote a letter expressing "grave concerns" about introducing the father into G.B.'s life,

> Before I would recommend letter writing to begin, I would need to have communication with [the father's] therapist indicating that he has been attending sessions consistently and is making progress on his treatment goals. I also need verification from the social worker that communications with [the father] are much improved as evidenced by his ability to express feelings appropriately during conversations with her.

The father and Billie did complete the nine-hour Love & Logic parenting class (three, three-hour sessions on November 13 and 20, and December 4, 2013). The father's initial assessment for counseling sessions was completed in early December 2013. He attended his first therapy session on January 15, 2014. His therapist provided a progress report dated January 24 stating,

> As of this time goals have not been officially set with [the father]. He reports that he is coming to counseling sessions as part of the process to gain custody of his daughter [G.B.] Due to only having one session with him thus far, I have not had enough contact with him to make any determinations regarding his progress or recommendations.

The State filed a petition to terminate the father's rights to G.B. on January 30, 2014. A permanency hearing was scheduled for February 12, 2014, but the parties agreed to continue the hearing to coincide with the time set for the trial on termination of parental rights—March 20.

The father attended therapy sessions on February 13 and February 28, 2014. On March 11, his therapist's progress report states,

> Our sessions have consisted of getting to know James and rapport building in session. We discussed his treatment goals and needs, which includes anger management and parenting. The ultimate focus of each session revolves around his journey to obtain parental custody of his daughter, despite seeing many obstacles in his way. This topic seems to provoke a lot of thoughts

and feelings for James in addition to anger. James has been actively involved in his sessions.

The father did not appear personally at the March 20 permanency/termination proceeding. His attorney asked that the father be allowed to participate telephonically. The court found the father had had sufficient notice to make arrangements to be present and denied the request; however, James and his wife were allowed to testify via telephone.

Social worker Amanda Ahrenstroff testified her initial contact with the father was on October 9, 2013, the day after a review hearing.[3] She had received letters and postcards for G.B. from James but she had not delivered them to G.B. due to the therapist's recommendation. She recommended termination of parental rights because the father, though having completed the parenting classes, had had no contact with G.B. though she was six years old, and the anger issue he was dealing with had been outstanding for many years. She testified she did not believe additional time would result in G.B. being placed with him. Ahrenstroff also testified G.B.

> needs permanency now, and she doesn't have a relationship with her father, and she's never met him. James hasn't demonstrated through the history of the case that he is able to provide a safe, stable and permanent home for [G.B.] There are continued risks for James that include prior termination, a denied home study, and a history of child abuse for both him and his wife.

In its order terminating the father's parental rights, the court observed that since October 2013, James had written G.B. letters and postcards, had completed a parenting class, obtained his GED, and initiated therapy, but the

---

[3] She stated she had telephone and email contact with the father about ten times, and that phone calls "typically ended in him hanging up on me."

therapist had no recommendation as to when James might be introduced into G.B.'s life. The court also wrote:

> [G.B.] was born . . . almost 7 years ago. James has never met [G.B.]. Paternity was not established until March 2013—6 years after [G.B.]'s birth. . . .
>
> James made no effort to support [G.B.] financially, except for a few bills he claims he paid at Jessica's request. His excuses for not paying any child support included not knowing he was [G.B.]'s father and that he was not court ordered to pay. Those excuses hold no merit. Paternity could have been established long ago, as well as arrangements for support payments.
>
> . . . .
>
> [G.B.] is suffering from that lack of stability, structure and nurturing—she is only 7 years old. To now introduce her to a man who did not put forth any effort to be a part of those 7 years, who physically and emotionally abused her older siblings, who did not financially support her, and who did not make any effort to visit her as he claimed he would, would be beyond detrimental to her physical, mental, and emotional condition and needs.

The father appeals.

**III. Discussion.**

Termination of parental rights under chapter 232 follows a three-step analysis. *See In re P.L.*, 778 N.W.2d 33, 39 (2010).

> First, the court must determine if a ground for termination under section 232.116(1) has been established. If a ground for termination is established, the court must, secondly, apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in a termination of parental rights. Third, if the statutory best-interest framework supports termination of parental rights, the court must consider if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights.

*In re D.W.*, 791 N.W.2d 703, 706-07 (Iowa 2010) (citations omitted).

The father does not dispute the existence of the statutory grounds for termination except to argue that reasonable efforts at reunification have not been made. We reject this contention. The juvenile court specifically addressed the

requirement that reasonable efforts be made to reunite parent and child, and we adopt its findings:

> There are no additional services that can be provided to James that would allow for the placement of [G.B.] in his home now or at any time in the foreseeable future. He left Iowa when he knew Jessica was pregnant. He took no steps to establish paternity. There were only excuses. He has put forth little to no effort over the past 7 years to become [G.B.]'s father. The services James has participated in are limited and his participation was only after he was "ordered" to participate. [G.B.] has waited long enough for her father to make her a priority in his life.

The father did not request additional services. *See In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005) ("The Department has an obligation to make reasonable efforts toward reunification, but a parent has an equal obligation to demand other, different, or additional services prior to a permanency or termination hearing.").

The father did request additional time and asserts the juvenile court erred in failing to grant him an additional six months to seek reunification. A court has discretion to "continue placement of the child for an additional six months." Iowa Code § 232.104(2)(b); *see also id.* § 232.117(5). This provision requires the court to set forth "factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b); *A.A.G.*, 708 N.W.2d at 92.

We conclude additional time is not warranted here because we are convinced the need for G.B.'s removal would still exist at the end of a six-month period. The father and child have no relationship. The father has long-standing anger issues and began individual therapy just a few weeks before the

termination hearing. His therapist has no recommendation as to when father might begin a relationship with his daughter. The home study evaluator recommended services be offered and *then* DHS could "decide on the appropriateness of a subsequent home study 6-12 months after ongoing contact with James and [G.B.]" Such a time frame is not acceptable. *See A.M.*, 843 N.W.2d at 111 ("Our legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." (internal quotation marks, citation, and corrections omitted)).

Because statutory grounds for termination exist, termination is in the child's best interests, and no factor weighing against termination is pertinent, we affirm the termination of the father's parental rights to G.B.

**AFFIRMED.**